# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 14-981

STATE OF LOUISIANA

VERSUS

JAYMES LAMAR HARRIS

**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 311,414
HONORABLE PATRICIA EVANS KOCH, DISTRICT JUDGE

**********

## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders, and Phyllis M. Keaty, Judges.

**CONVICTIONS AND SENTENCES AFFIRMED.**

James C. Downs
District Attorney – 9th Judicial District
Michael W. Shannon
Assistant District Attorney – 9th Judicial District
P. O. Drawer 1472
Alexandria, LA 71309
Telephone: (318) 473-6650
COUNSEL FOR:
    Plaintiff/Appellee - State of Louisiana

Jermaine L. Harris
620 Murray Street
Alexandria, LA 71301
Telephone: (318) 442-6240
COUNSEL FOR:
    Defendant/Appellant - Jaymes Lamar Harris

**THIBODEAUX, Chief Judge.**

Jaymes Lamar Harris appeals from convictions and sentences for one count of second degree murder under La.R.S. 14:30.1(A)(1) or (2) and one count of obstruction of justice under La.R.S. 14:130.1(A)(1)(a). Finding sufficient evidence to support the jury's verdicts, we affirm both convictions and sentences. We refer two of the defendant's claims of ineffective assistance of counsel to post-conviction relief.

## I.

### ISSUES

We must decide:

(1)   whether the evidence presented at trial was sufficient to support a conviction of second degree murder;

(2)   whether the evidence presented at trial was sufficient to support a conviction for obstruction of justice;

(3)   whether the trial court deprived Mr. Harris of his federal and state constitutional rights to compulsory process and to put on a defense; and

(4)   whether Mr. Harris was denied effective assistance of counsel under the Sixth and Fourteenth Amendments to the U.S. Constitution.

## II.

### FACTS AND PROCEDURAL HISTORY

At 10:46 a.m. on May 15, 2012, the Rapides Parish Communications District received a 911 call regarding the death of a child. Upon arrival at the scene, police found a twenty-one-month-old female child, Aleecia Miller, lying in a bed. The child's body appeared to be covered in a Vaseline-type substance, was

cold to the touch, and was already stiffening due to rigor mortis. The forensic pathologist determined that the victim had been dead at least eight to twelve hours when the police discovered her. The cause of death was determined to be "acute peritonitis due to stomach perforation resulting from blunt force injuries," and the manner of death was determined to be homicide. The forensic pathologist also found approximately sixteen bruises on the victim's body, all of which appeared to be less than eighteen hours old. Defendant Jaymes Harris and the victim's mother, Porsha Miller, were arrested for second degree murder and obstruction of justice.

Both were charged by grand jury indictment with one count of second degree murder, a violation of La.R.S. 14:30.1(A)(1) or (2), and one count of obstruction of justice, a violation of La.R.S. 14:130.1(A)(1)(a). The State severed the trials. The only defendant in the present appeal is Jaymes Lamar Harris.

Mr. Harris pled not guilty to the charges. He subsequently filed an Application for Appointment of Sanity Commission, raising the issues of capacity to defend and capacity to understand right from wrong at the time of the crime. Following a contradictory hearing, the trial court found Mr. Harris competent to proceed. Following trial, the jury found Mr. Harris guilty of second degree murder on count one and guilty of obstruction of justice on count two.

For second degree murder, Mr. Harris was sentenced to life imprisonment without benefit of probation, parole, or suspension of sentence. For obstruction of justice, he was sentenced to twenty years, to run concurrently with the life sentence imposed for second degree murder.

III.

## LAW AND DISCUSSION

### Sufficiency of the Evidence

The defendant alleges that the evidence was insufficient to convict him of second degree murder and obstruction of justice.

*Standard of Review*

> The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." The *Jackson* [*v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979)] standard of review is now legislatively embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." The appellate court's function is not to assess the credibility of witnesses or reweigh the evidence.

*State v. Francis*, 12-1221, pp. 6-7 (La.App. 3 Cir. 4/3/13), 111 So.3d 529, 533, *writ denied*, 13-1253 (La. 11/8/13), 125 So.3d 449 (citations omitted).

*Evidence Introduced at Trial*

Sonya Gremillion testified that she received the 911 call regarding the victim's death at 10:46 a.m. on May 15, 2012. Two Rapides Parish Sheriff's Deputies who responded to the call testified regarding their investigations.

Detective Stephen Phillips arrived at approximately 11:19 a.m. He found the child lying on a bed about knee high in what appeared to be her bedroom. She was cold to the touch and stiffening due to rigor mortis. He opined that she had been dead at least twelve hours or more.

Deputy Randell Isles arrived at the scene at 11:33 a.m. He testified that the "baby" was lying on the bed, dressed in a white shirt and diaper. The bed

3

was soiled and smelled of urine, but the victim's diaper was clean. A Vaseline substance was all over the victim's body. She had swelling and red marks around her eyes, swelling in her stomach, fluid oozing out of her nose and mouth, and a small blood hemorrhage in her eye. He saw discoloration and red marks on the left side of her torso, and swelling, red marks, and bruising on the right side. Later he saw an "older brand slash burn on [the child's] upper right shoulder" which looked like the very top of a cigarette lighter. On the floor, a spot near the bed appeared to be some type of bowel or ooze. Another spot was found on the mattress, and an odor of urine was detected in a comforter balled up on the bed. All window units in the residence were off.

Detective Phillips spoke with the defendant at the scene. Mr. Harris said the victim was the child of his girlfriend, and they lived at the residence together. He gave an account of events beginning at noon the previous day. After eating pancakes, the victim started vomiting and felt feverish. They went to bed around 9:00 p.m. Later that evening, into the early morning hours, he heard Aleecia fall out of bed. He put her back in her bed and went back to his bed. When he got up the next morning, Aleecia was face down on the floor near her bed. He did not enter the room. He went to his mother's residence a couple of blocks away, talked to his mother for ten minutes, and returned home. He then checked on Aleecia and thought she may be deceased. He informed the child's mother and "the two of them went and made contact with their landlord . . . asked for her assistance to come back because they didn't know what was wrong with the child."

Detective Phillips said he was somewhat suspicious upon seeing obvious signs of bruising in various stages, which did not appear consistent with a

4

mere accident. He described a shiny substance on the victim like Vaseline, a container of which was later discovered on Mr. Harris' bed. Detective Phillips also thought it odd that the victim was wearing a crisp, clean diaper from the package, as if it had just been placed on her. Because of the coldness and stiffness of the victim's body, he concluded that there was a delay in reporting her death. His suspicions were further aroused by the defendant's statement that he found the victim on the floor. He believed that if the victim was still on the floor with her arms stiff, she would have been elevated off the floor. He reported that Willie Mae Young, the neighbor/landlord, was the first person to call 911. As a result of his investigation and the pathology report, Detective Phillips obtained a warrant to arrest both Jaymes Harris and Porsha Miller for second degree murder and for obstruction of justice as "it appeared that the scene had been tainted and/or rearranged, moved, staged." Subsequently, Detective Phillips recorded two additional statements made by the defendant.

In the May 16, 2012 statement, the defendant said he did not know what happened. He reported similar events including the pancakes and Aleecia's fall from bed. In this statement, Aleecia woke up three or four times, and Porsha also got up to check on her. The next morning, Harris checked on Aleecia; she was face down on the floor; and he went to his mom's house. When he returned home, he checked again and told his "old lady" that the "baby was dead." The defendant said Aleecia was not wearing any clothes because she was hot. He put a diaper on her because he was not comfortable with her being without a diaper in front of other people. He stated that he barely disciplined the child and spanked her on her hand or her butt. He claimed that he did not know how Aleecia received her injuries.

5

In the May 18, 2012 statement, the defendant attempted to blame Porsha Miller for everything. He said he got up in the middle of the night and saw Aleecia standing in the middle of the floor in a daze. He put her back in her bed. He stated that Porsha was getting aggravated with the child because she would not stay in bed. One of the times Porsha got up, he saw her "trying to discipline" Aleecia. He described Porsha's "discipline" as swinging her arms "wild" at the victim and hitting her. The defendant stated that he tried to stop Porsha from "whooping" the child and he probably "nipped" the victim a couple of times. He also stated that he blacked out, and he probably hit the child because whatever he hit felt different from hitting the bed. He said Porsha stayed with Aleecia, and he went back to bed. The next morning, he put a blanket on Aleecia because it was cold in the house and then went to see his mom. When he returned to his house and tried to pick the victim up off the floor, he could not do so. He said it was like she was frozen to the floor. The defendant said he and Porsha panicked and went to tell Ms. Young that "my baby was dead." He went to tell his mom and returned to his house to find Ms. Young trying to administer CPR.

When asked how the child came to be wearing a diaper, the defendant stated that he put the diaper on her because it was "freezing cold." When asked about the Vaseline on the victim, the defendant replied:

> A:     Porshia[1] was trying, she was trying to rub the Va… the Vaseline on her to um, (inaudible) my mom, my mom was saying something about like she, she like (inaudible) when Aleecia use to like Aleecia she, she always like jump, jump off the bed (inaudible) and she always like bruised herself.
>
> Q:     Right.

---

[1]The transcript of the May 16, 2012 statement spells Porsha as "Porshia."

A:      So my mama use, my mama was telling us like if you like rub, rub the Vaseline on her and stuff for the to make, make most, make the bruises go away.  So Porshia, she tried to, she tried to rub the Vaseline on her and to make, make some make the bruises go away.  The bruises, the bruises went didn't go no where.

Q:      When did she tell you that, that morning?

. . . .

A:      My mom, she told me that, that morning, that morning when I went back when I came back from her house.

When asked how the subject of Vaseline came up, the defendant said that he brought it up.  When asked who put the Vaseline on Aleecia, the defendant answered "Porshia" and then stated:

A:      Porshia start off rubbing it on her face.

Q:      Okay, what on her face?

A:      The Vaseline.

Q:      Okay, where did y'all do this at?  Your room, the baby's room?

A:      She did the Vaseline in the baby's room.

The defendant was asked if he knew anything about a rag found in the bottom of his dresser drawer that "had some of the same stuff that was on the bed." He stated that he was confused and knew nothing about the rag.  He further stated:

A:      I'm thinking Porshia must of, must have been doing a lot when I left to go to our mama about the, the baby being dead. Cause I, I didn't know nothing about no rag no, no rag being in the room or nothing.

Detective Phillips testified at trial that since the arrest, Porsha had given birth to the defendant's child, and the child had been placed in foster care.

The next witness to testify was Jarrod Guin, an inmate incarcerated for "simple burglary, accessory after the fact."  Mr. Guin testified that he and the

7

defendant were housed in the same cell block, which was separated from the women's cell block by a very thin wall. The inmates created a hole between the two cells so that the men and women could talk. Mr. Guin said he overheard the defendant speaking with a woman on the other side of the wall, whom the defendant identified as Porsha Miller, and as his wife. When asked what he overheard the defendant say to Porsha, Mr. Guin replied:

> A:    To just be cool, that his mom had him a good lawyer, everything was going to be all right. They ain't never going to find out what happened.

When asked if the defendant ever mentioned his own daughter, Mr. Guin responded, "Yeah, that she was pregnant with his daughter, that we needed to worry about ours. Get out and get her back." The defendant told Mr. Guin that his daughter was in foster care. When asked if the defendant ever said anything about Aleecia, Mr. Guin replied, "He really didn't care for her that much." The defendant told Mr. Guin that the victim was "spoiled rotten," needed lots of attention, cried a lot, always caused trouble between him and Porsha; and that he would get angry when Aleecia woke him up with her crying. The defendant also told Mr. Guin that every time he looked at Aleecia, he would see some other man.

When the State asked Mr. Guin if the defendant ever talked to him about how he disciplined Aleecia, the following colloquy ensued:

> A:    He said he would whip her on occasions.
>
> Q:    Did he ever indicate that he got carried away with her?
>
> A:    He said he got carried away one time, he didn't know what happened to her.
>
> Q:    And what?
>
> A:    He didn't know how bad he had whipped her.

8

Q: Okay. When he said that did he indicate that that had anything to do with her death?

A: He said he tried to give her CPR and couldn't get her back.

Q: So I – let me correct and I – he said he whipped her - -

A: Yeah.

Q: - - and then later tried CPR?

A: Yeah, once he realized she wasn't responsive.

. . . .

Q: Did he talk about how hard he whipped her?

A: He didn't say how hard, he just said he – he whipped her pretty rough.

Mr. Guin indicated that what he was told about the whipping made him angry because it could have been his child and there were other ways of disciplining children these days. Mr. Guin further testified that he heard the woman cry while talking with the defendant. He also heard the defendant tell the woman to forgive him, that he would make it up to her, and, "Stick with the story." When asked what the defendant told him the story was, Mr. Guin stated, "That she had a parasite in her stomach and killed her." When cross-examined, Mr. Guin admitted that he had other convictions, but said he was promised nothing in exchange for his testimony.

Forensic Pathologist Dr. Christopher Tape testified that he autopsied the victim on May 16, 2012. He opined that the cause of death was "acute peritonitis due to stomach perforation due to blunt force injuries to body." Considering all of the victim's internal and external injuries, Dr. Tape opined that they were caused by blunt force impact, and the trauma was "nonaccidental," or

"inflicted trauma." He classified the death as a homicide. He explained that the perforation of the stomach had blood around it. Essentially, the peritonitis was the inflammation of the abdominal cavity caused when the intestines opened, allowing partially digested food, stomach acid, and bacteria from the bowel to leak into the abdominal cavity, creating a deadly combination. Acute means that it happened quickly; it was not chronic. He also saw no evidence of parasites in the victim.

Dr. Tape described multiple internal injuries including bruises to each kidney; contusions on both lungs; a contusion in the muscle under the skin of the left upper quadrant of the abdomen; a muscle hemorrhage underneath the skin in the muscle of the right buttock and the right lower back; the stomach perforation surrounded by serosal contusion (meaning outside of the organ) and hemorrhage; multiple contusions of the mesentery (vascular structure that holds the loops of intestine together) and the small intestine serosa (thus bruising on both the outside of the intestine and on the support structure of the intestine); and contusion of the serosa of the esophagus. When asked if someone could cause the injuries by blacking out and throwing their hands around to "nip the body," Dr. Tape answered, "You would have to nip it very hard and multiple times."

Using photographs, Dr. Tape pointed out external injuries to the jury, including a bruise on the victim's right forehead that extended to the right eyebrow; a contusion and scratch on the victim's right cheek; and a number of well-healed, permanent scars. He approximated that there were sixteen bruises on the child's body. Dr. Tape explained that bruises go through a sequence of color changes as the hemoglobin breaks down. Since none of the victim's bruises were yellowing, they all appeared to be less than eighteen hours old. The jury was also

shown a healed scar on the victim's right shoulder that was consistent with the top of a cigarette lighter, and a large bruise on the flank that extended to the back.

Based upon the stiffness and temperature of the victim's body when she was found, Dr. Tape opined that she had been dead at least eight to twelve hours prior to the death being reported. He found contusions on the victim's back consistent with the victim having been slapped with a hand with the force of a significant blow. When asked if the injuries could be the result of the victim's having rolled off of the bed, Dr. Tape said, "No. Any one of them perhaps with a high enough bed, perhaps you can get one injury, but you wouldn't likely get these multiple injuries."

Dr. Tape discussed the petechial hemorrhages in the victim's right and left eyes, describing them as force injuries. The largest one was actually multiple hemorrhages coming together. He believed each petechial hemorrhage was an extension of a correlating bruise or contusion on the face. Pointing them out one by one, Dr. Tape explained, "Whatever caused this bruise probably caused that petechial hemorrhage. Whatever caused this bruise you can see it coming right to the corner of the eye there probably caused that petechial hemorrhage right there."

Dr. Tape said the particular bruise on the victim's right flank was caused by significant force. When asked whether a fall from eighteen to twenty-four inches would cause this type of injury, Dr. Tape replied, "No." When asked, he said he was not able to determine whether the injuries were caused by a man or a woman. When asked whether the victim's well-healed scars were consistent with repeated abuse, Dr. Tape stated: "The cigarette – the scar that's consistent with a cigarette lighter and the multiple injuries and multiple spots, acute injuries and chronic injuries, yes, I would say it's consistent with abuse, chronic abuse."

11

Dr. Tape agreed that the fatal blow had occurred within eighteen hours of the investigation. After Dr. Tape's testimony, the State rested its case.

Leonard Goff testified that he considered the defendant his stepson. He said he had observed him since childhood and believed him to have "special needs," explaining that he was on medication, had visions and headaches, and "he would hear voices and stuff." Mr. Goff also testified that the defendant had gone to a special school. He said the defendant was very gentle with the victim and very protective of her. He said the defendant met Porsha via the internet and went to Arkansas where he stayed with her. Mr. Goff went there to get the defendant and found them living in a run-down store. He described Porsha's and the baby's clothing as "dingy" and said the child had sores on her skin. Porsha and the child came back to Louisiana with them around December 2011.

The defendant's aunt, Michelle Embery, described the defendant as being a "slow child," and as being slow in his mental capacity. Ms. Embery believed that she met Porsha in December 2011. She thought the baby needed to be taken to the doctor because of the "stuff all over her body." Ms. Embery could not describe the "stuff" but stated that she would not describe it as bruises. She testified that she never saw the defendant discipline the victim.

The defendant's sister, Alvera Curry, also testified that the defendant was a little slow as a child, and that he received government disability assistance for ADHD. She first met Porsha in December 2011. She described Porsha and the victim as dirty and said the victim had "stuff" all over her skin. Ms. Curry did not see any bruises or marks on the victim's skin (other than the skin condition) when the victim first arrived from Arkansas. Ms. Curry saw the defendant verbally, but

not physically, discipline Aleecia. She said she last saw Porsha and Aleecia a week or two before the death. Between December 2011 and May 2012, Curry spent a night with the defendant, at which time she bathed "the baby." When asked if she noticed bruises, Ms. Curry testified that she did notice bruises on the baby's arm. When shown a photo of the cigarette lighter mark, she said she did not notice this mark when she bathed the baby.

The last witness to testify was the defendant's mother, Eva Curry. She testified that when she and Mr. Goff went to get the defendant in Arkansas, Porsha and the victim were "nasty and dirty." When bathing Aleecia, she saw bites all over her. Eva also testified that she thought something was wrong with Aleecia because she screamed a lot, and it sounded like she was in pain. She also said Aleecia's stomach was swollen and that she told Porsha that the victim needed to see a doctor. When asked if she ever saw the defendant discipline Aleecia, Eva replied, "No, they didn't discipline that baby." When asked whether she ever told the defendant that putting Vaseline on a bruise would help the bruise fade, Eva answered:

> A: No, I told him that the compound that the doctor gave the baby, which was for the eczema, I told him that the stuff that the baby had all over her, the compound is used to put on that stuff. Jaymes called them bruises because of the way they looked to him but they was [sic] eczema and there was a bottle of compound, it wasn't grease, he just said it's grease, Vaseline, but it's not Vaseline, it's a compound that they give them that they put on children for funguses.

Eva stated that the morning the victim died, the defendant asked her for the "stuff to go on the baby's body and stuff that she had on her." Eva said she told the defendant to go get the child so she could be taken to the doctor. The next

13

time Eva saw the defendant, he was running and stumbling, was very upset and said something was wrong with the baby. Eva thought Porsha had miscarried.

*Sufficiency of the Evidence as to Second Degree Murder*

Mr. Harris was charged with second degree murder which is defined, in pertinent part, as follows:

> A. Second degree murder is the killing of a human being:
>
> (1) When the offender has a specific intent to kill or to inflict great bodily harm; or
>
> (2) When the offender is engaged in the perpetration or attempted perpetration of . . . cruelty to juveniles, second degree cruelty to juveniles . . . even though he has no intent to kill or to inflict great bodily harm.

La.R.S. 14:30.1

> Cruelty to juveniles is defined, in pertinent part, as follows:
>
> A. Cruelty to juveniles is:
>
> (1) The intentional or criminally negligent mistreatment or neglect by anyone seventeen years of age or older of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child. Lack of knowledge of the child's age shall not be a defense[.]

La.R.S. 14:93.

> Second degree cruelty to juveniles is defined, in pertinent part, as follows:
>
> A. (1) Second degree cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect by anyone over the age of seventeen to any child under the age of seventeen which causes serious bodily injury or neurological impairment to that child.

14

(2) For purposes of this Section, "serious bodily injury" means bodily injury involving protracted and obvious disfigurement or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or substantial risk of death.

La.R.S. 14:93.2.3.

The defendant asserts that the State's case was based solely on circumstantial evidence since no eyewitnesses testified at trial as to seeing him kill the victim. He argues that there was insufficient evidence to prove he specifically intended to kill the victim, and there was insufficient evidence to prove that he killed the victim while committing the felony of cruelty to a juvenile. The defendant further asserts that there was a sufficiently reasonable hypothesis of innocence, that is, "Porsha Miller struck the fatal blow that caused the death of A.J.M. and was responsible for the repeated abuse of A.J.M."

Considering the victim's cause and manner of death, we find that there was sufficient evidence that whoever inflicted the injuries upon Aleecia Miller specifically intended to kill the victim *or* to inflict great bodily harm, *or* without such intent, killed her while committing cruelty to a juvenile. The evidence was sufficient to prove that whoever inflicted the injuries intentionally mistreated the victim, thus committing cruelty to a juvenile. Where the cause of death was non-accidental blunt force trauma, and the bruises were inflicted within eighteen hours of the discovery of the victim, there was sufficient evidence to prove that the victim died during the commission of cruelty to a juvenile. The only issue remaining is the identity of the person who inflicted the injuries. This court has stated the following regarding circumstantial evidence:

[W]hen the conviction is based upon circumstantial evidence, La.R.S. 15:438 provides that such evidence must exclude every reasonable hypothesis of innocence.

> *State v. Camp*, 446 So.2d 1207 (La.1984); *State v. Wright*, 445 So.2d 1198 (La.1984). However, La.R.S. 15:438 does not establish a stricter standard of review on appeal than the rational juror's reasonable doubt standard. . . . On appeal, the issue is whether a rational trier of fact, when viewing the evidence in a light most favorable to the prosecution, could find that all reasonable hypotheses of innocence were excluded.

*State v. Dotson*, 04-1414, p. 2 (La.App. 3 Cir. 3/2/05), 896 So.2d 310, 312.

Additionally, when a jury "'reasonably rejects the hypothesis of innocence presented by the defendant[], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt.'" *State v. Strother*, 09-2357, p. 11 (La. 10/22/10), 49 So.3d 372, 378 (quoting *State v. Captville*, 448 So.2d 676, 680 (La.1984)).

In support of his hypothesis of innocence, the defendant refers to his December 18th statement wherein he told Detective Phillips that he saw Porsha swinging wildly at the victim. He also refers to the conditions in which Porsha and Aleecia lived before coming to Louisiana—living in an abandoned store, being dirty, and the victim's having sores all over her body. These facts, the defendant argues, show that the victim was neglected before she began living with him. We note, however, that none of the defendant's relatives who testified at trial recalled seeing bruises on Aleecia when she came to Louisiana. The jury obviously rejected the defendant's hypothesis of innocence. Considering all facts established—the victim lived with the defendant; she had bruises all over her body; there was delay in reporting her death; the defendant made inconsistent statements to the police about what happened; he told Mr. Guin he got carried away and whipped the victim "pretty rough" and then tried to revive her with CPR; and Mr. Guin's report of hearing the defendant tell Porsha to forgive him, stick with the

story, and no one would find out what happened—we find the jury's rejection of the defendant's hypothesis of innocence reasonable.

Additionally, the jury was instructed as to the law of principals and could have found that the defendant acted as a principal in the crime, even if the jury believed that Porsha abused Aleecia. The jury was instructed as follows:

> All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime are principles [sic].

The defendant asserts that the evidence was insufficient to find him guilty as a principal to second degree murder because there was no evidence that he counseled, procured, or assisted anyone in the killing of the victim. As fully discussed above, the evidence belies this assertion: the delay, the defendant's presence and participation, his own admissions, his inconsistent statements to police, his remarks to Mr. Guin and in the hearing of Mr. Guin wherein the defendant asked Porsha's forgiveness and told her to "stick with the story" and no one would find out what happened. Given this evidence, the jury could have reasonably found that the defendant and Porsha acted as principals in the second degree murder of the victim.

The defendant asserts that no evidence was presented regarding Aleecia Miller's exact age, and, thus, the State failed to prove a necessary element of cruelty to juveniles. Pursuant to La.R.S. 14:93 and La.R.S. 14:93.2.3, the victim must be under the age of seventeen. The 2012 grand jury indictment lists Aleecia's date of birth as August 14, 2010. Dr. Tape indicated an age of twenty-one months. The defendant's statements repeatedly refer to her as a "baby," as did his family

17

members at trial.  Photographs clearly show that the victim was a toddler.  The evidence is clear that Aleecia was a juvenile under the statutes.  We find that the evidence was sufficient to find the defendant guilty of second degree murder.

### *Sufficiency of the Evidence as to Obstruction of Justice*

Obstruction of justice is defined in La.R.S. 14:130.1A(1)(a) and B(1), in pertinent part, as follows:

> A.  The crime of obstruction of justice is any of the following when committed with the knowledge that such act has, reasonably may, or will affect an actual or potential present, past, or future criminal proceeding as hereinafter described:
>
> (1)   Tampering with evidence with the specific intent of distorting the results of any criminal investigation or proceeding which may reasonably prove relevant to a criminal investigation or proceeding.  Tampering with evidence shall include the intentional alteration, movement, removal, or addition of any object or substance either:
>
> > (a)     At the location of any incident which the perpetrator knows or has good reason to believe will be the subject of any investigation by state, local, or United States law enforcement officers; . . .
>
> . . . .
>
> B.  Whoever commits the crime of obstruction of justice shall be subject to the following penalties:
>
> (1) When the obstruction of justice involves a criminal proceeding in which a sentence of death or life imprisonment may be imposed, the offender shall be fined not more than one hundred thousand dollars, imprisoned for not more than forty years at hard labor, or both.

The defendant asserts that there was no evidence that he specifically intended to distort the results of the investigation into the victim's death.  He

18

argues that he placed a diaper on Aleecia because it was cold, not to distort the investigation. Additionally, he asserts that there was no evidence that he picked the victim up from the floor after she was deceased, or, even if he did, that he specifically intended to distort the investigation. Finally, he contends that the Vaseline was rubbed on the victim by Porsha and that there is no evidence that his mentioning Vaseline to his mom the morning Aleecia was found indicates that he specifically intended to distort the investigation.

In *State v. Megason*, 10-112, p. 5 (La. 10/6/10), 47 So.3d 31, 34, this court described specific intent as follows:

> Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). Because specific intent is a state of mind, it does not need to be proven by fact; it may be inferred from the circumstances and the actions of the defendant. *State v. Allen*, 99-320 (La.App. 5 Cir. 7/27/99), 742 So.2d 949. The existence of specific intent is for the trier of fact to determine, and review of this determination is correctly made under the *Jackson* standard. *Id.*

Here, the defendant admitted that he put the diaper on Aleecia, but changed his testimony regarding the reason for doing so. In one statement, he said the victim was not wearing any clothes because she was hot, and he put a diaper on her because he was uncomfortable with other people seeing her. In another statement he said he put the diaper on her because it was "freezing cold." He said when he came back from his mother's house the first time, he could not lift the baby off the floor because she was "frozen" to the floor. The air conditioning window units were not on in the residence when the officers arrived. It was the middle of May. While the defendant stated that Porsha rubbed the Vaseline on the victim, he admitted that when he went to see his mom the morning the victim was

19

found, he told his mom they needed Vaseline. The defendant said the Vaseline was to make the bruises go away, but it did not work. He indicated that he was there when Porsha starting applying it, but he also indicated that he found the baby dead when he came back from his mother's house the first time. This begs the question, if the baby was already dead, why the Vaseline?

His mother denied discussing Vaseline or bruises; yet, the defendant told a rather detailed account of its purposes. While the defendant introduced evidence that he was "slow" and may have done things to clean up without intending to distort the investigation, the jury could reasonably reject this hypothesis of innocence and infer intent, pursuant to *Megason*, 47 So.3d 3, in light of the defendant's actions and statements, including his statement to Porsha to "stick with the story" and "they'll never find out what happened."

The evidence revealed that the victim had been dead for eight to twelve hours before anyone called 911, indicating a delay in reporting her death. Considering all of these facts, we find that the jury reasonably found that the defendant tampered with evidence with the specific intent to distort the results of the criminal investigation. Accordingly, we find that the evidence was sufficient to find the defendant guilty of both second degree murder and obstruction of justice.

### *Right to Compulsory Process and Defense*

The defendant asserts that the trial court deprived him of his constitutional right to compulsory process when the co-defendant, Porsha Miller, was not required to testify as a witness in his defense. Instead, the court accepted a blanket assertion of her Fifth Amendment privilege not to incriminate herself.

20

Citing La.R.S. 15:276,[2] the defendant asserted that the trial judge was not bound by such assertion. He argued that he only wanted to call Porsha to establish a relationship between herself, the child, and the defendant, merely asking for names, addresses, and how and when they met. The State argued that everything the defendant sought to ask had already been established through other witnesses. The trial court offered to let him re-examine the witnesses. Defense counsel argued that he wanted to explore Aleecia's relationship with her biological father and the alleged statements the defendant made to Mr. Guin. The trial court expressed its concerns that putting a co-defendant on the stand just for the purposes of having her take the Fifth on a question-by-question basis would lead to reversible error issues. Ultimately, the court accepted Porsha's assertion of her Fifth Amendment privilege, via her attorney and out of the presence of the jury.

In *State v. Wilson*, 394 So.2d 254, 259 (La.1981), the supreme court held that the trial court committed reversible error by refusing to order a witness to answer the defendant's questions and assert the privilege on a question-by-question basis. Subsequently, however, in *State v. Brown*, 514 So.2d 99 (La.1987), *cert. denied*, 486 U.S. 1017, 108 S.Ct. 1754 (1988), the supreme court articulated that a co-defendant's blanket assertion of the Fifth Amendment privilege was appropriate. Citing *State v. Darby*, 403 So.2d 44 (La.1981), *cert. denied*, 454 U.S. 1152, 102 S.Ct. 1022 (1982); *State v. Edwards*, 419 So.2d 881 (La.1982); and *State v. Coleman*, 406 So.2d 563 (La.1981), the supreme court in *Brown* stated:

---

[2]No witness can be forced to criminate himself, but the judge is not bound by the witness' statement that the answer would criminate him, when from the nature of the question asked and the circumstances of the case such statement can not be true.

La.R.S. 15:276

> *Darby*, *Edwards*, and *Coleman* all held that question by question invocation of the privilege was not necessary under circumstances in which the witness invoking the privilege was charged with participating in the same crime as the defendant on trial and in which it was apparent that the questioning would be devoted to subject matter which would require the defendant to invoke the privilege . . . . In other words, where a witness in this position has reasonable grounds to assert the privilege as to the entire area of expected questioning, we have not required the witness to take the stand and risk making an injurious disclosure through any answer or explanation of a refusal to answer.

*Brown*, 514 So.2d at 110-11. *See also State v. Bright*, 98-398 (La. 4/11/00), 776 So.2d 1134.

The defendant argues that the trial court did not apply the proper legal standard because it did not specifically decide that the defendant's questions would have given Porsha reasonable cause to apprehend danger from directly answering the questions or from explaining why an answer could not be given. He contends that instead, the trial court simply found that the information sought from Porsha had already been elicited from other witnesses. He seeks to distinguish *Brown*, *Darby*, *Edwards*, and *Bright*, arguing that the questions sought by the defendants in those cases concerned the events surrounding the crime itself. He argues that here, the testimony sought from the co-defendant would not have concerned any of the events surrounding the victim's death. He further asserts that his purpose in calling Porsha Miller was not to draw a negative evidentiary inference, but to rebut and discredit the statements of Jarrod Guin, such as, when Aleecia cried for her real dad, Harris would tell her "he ain't coming" and would sometimes whip her and tell her that "he was her daddy now." The defendant argues that Porsha could have testified about whether Aleecia knew or had a relationship with her biological father without incriminating herself in the death of the child.

Defense counsel correctly asserts that the trial court did not specifically determine that Porsha's answers to the proposed questions would have caused her reasonable apprehension of an injurious disclosure. It is apparent from the trial court's reasoning that it was more concerned with improperly allowing the defendant to call Porsha to the stand knowing that she would assert her Fifth Amendment privilege, an assertion preferably made outside the jury's presence:

> It is improper conduct for either the prosecution or the defense to knowingly to call a witness who will claim a privilege, for the purpose of impressing upon the jury the fact of the claim of privilege. American Bar Association Standards of Criminal Justice, Relating to the Prosecution Function, Standard 5.7(c), and Relating to the Defense Function, Standard 7.6(c) (1971).
>
> As the commentaries to these standards indicate, claims of privilege are preferably determined outside of the presence of the jury, since undue weight may be given . . . to the claim of privilege and due to the impossibility of cross-examination as to its assertion. . . . For similar reasons, the courts have uniformly rejected a defendant's claim of error based upon the denial of his request that a witness assert his claim of privilege before the jury.

*State v. Berry*, 324 So.2d 822, 830 (La.1975), *cert. denied*, 425 U.S. 954, 96 S.Ct. 1731 (1976).

Even though the trial court erred in failing to determine whether Porsha would be placed in an injurious position by asserting her Fifth Amendment right on a question-by-question basis, the record does not support a finding that the defendant was prejudiced by the error. The defendant acknowledges that a harmless error analysis is applicable but cites cases pertaining only to a general harmless error analysis. We note the following cases where a harmless error analysis was applied to affirm the trial court's allowance of the Fifth Amendment privilege: *See State v. Coleman*, 406 So.2d 563 (La.1981) (finding no indication

that the witness's testimony would have helped the defendant's case); *State v. Johnson*, 404 So.2d 239 (La.1981), *cert. denied sub nom. Kelly v. Louisiana*, 456 U.S. 925, 102 S.Ct. 1970 (1982) (finding that none of the witness's statements would bear on a fundamental part of the State's case or bolster the defense); *State v. Larpenteur*, 93-1424 (La.App. 4 Cir. 4/28/94), 636 So.2d 1103 (finding that where testimony would tend to prove only that the witness was acting on the defendant's undocumented assertion, it would not have changed the outcome). Further, in *State v. P.T., Sr.*, 07-665 (La.App. 3 Cir. 12/5/07), 970 So.2d 1255, *writ denied*, 08-26 (La. 5/30/08), 983 So.2d 895, this court applied a harmless error analysis even though it did not expressly state such. In affirming the trial court, we found that while the witness's testimony may have raised the issue of the *victim's* credibility, it did "not offer any exculpatory testimony that would show that the defendant did not" commit the offense. *Id.* at 1259-60.

Applying a harmless error analysis to the present case, we find that the defendant fails to prove he was prejudiced by Porsha's invocation of a blanket Fifth Amendment privilege. The defendant asserts that the error was not harmless because Jarrod Guin was the State's star witness. We find that, while Mr. Guin was an important witness, the questions sought to be asked of Porsha would not have discredited Mr. Guin's testimony. None of Porsha's anticipated testimony about whether Aleecia knew or did not know her real father would have discredited Mr. Guin's testimony as to what the defendant *told* him regarding his feelings toward Aleecia, or what the defendant said he felt when he looked at Aleecia; i.e., that he would see another man. Further, it is not clear how Porsha's testimony about Aleecia's father would discredit Mr. Guin's testimony that the defendant whipped the child when she cried for her real dad.

None of the questions that appellate counsel claims the defendant wanted to ask Porsha regarding various relationships would have discredited Mr. Guin's testimony that he heard the defendant tell "the woman in the other cell" to keep cool, to stick to the story, to forgive him, and to remember that no one would find out what happened. Nor would Porsha's anticipated testimony have offered exculpatory evidence that the defendant did not commit the crimes with which he was charged. As found by the trial judge, the defendant's relationship with Porsha was explored through other witnesses. Thus, any error that the trial court committed in allowing Porsha to assert a blanket privilege was harmless.

Moreover, considering the apparently insignificant impact Porsha's testimony would have had on Mr. Guin's credibility, the defendant's right to present a defense did not outweigh Porsha's right against self-incrimination. In *P.T.*, 970 So.2d at 1259, this court quoted *State v. Haddad,* 99-1272, p. 5 (La. 2/29/00), 767 So.2d 682, 686, *cert. denied*, 531 U.S. 1070, 121 S.Ct. 757 (2001), holding that "[a]s a general proposition, when faced with resolving the tension between a witness's Fifth Amendment privilege against self-incrimination and a defendant's Sixth Amendment right to present a defense, this court has consistently recognized the witness's right not to incriminate himself." Accordingly, we find that this assignment of error lacks merit.

### Ineffective Assistance Claims

#### Continuance

The defendant contends that he was denied effective assistance of counsel due to his trial counsel's failure to move for a continuance after new evidence was revealed on the day trial was set. The day before testimony began,

25

defense counsel informed the trial court that the State just informed him (the previous day) that Jarrod Guin would be testifying at trial. Defense counsel objected to Mr. Guin's testimony based upon the timing. The State replied that it had just been informed by Mr. Guin's attorney that Mr. Guin had information concerning the case. In fact, the State did not see Mr. Guin's video statement until it was watched for the first time with defense counsel. We have found:

> Generally, the issue of ineffective assistance of counsel is a matter more properly addressed in an application for post conviction relief, filed in the trial court where a full evidentiary hearing can be conducted….

> The defendant's claim of ineffective assistance of counsel is to be assessed by [a] two part test[.] The defendant must show that counsel's performance was deficient and that he was prejudiced by the deficiency….

> This Court has recognized that if an alleged error falls "within the ambit of trial strategy" it does not "establish ineffective assistance of counsel." Moreover, as "opinions may differ on the advisability of a tactic, hindsight is not the proper perspective for judging the competence of counsel's trial decisions. Neither may an attorney's level of representation be determined by whether a particular strategy is successful."

*State v. Anderson*, 13-42, pp. 9-10 (La.App. 3 Cir. 7/3/13), 116 So.3d 1045, 1052, *writ denied*, 13-1806 (La. 5/16/14), 139 So.3d 1019 (quoting *State v. Griffin*, 02-1703, pp. 8-10 (La.App. 4 Cir. 1/15/03), 838 So.2d 34, 40, *writ denied*, 03-809 (La. 11/7/03), 857 So.2d 515) (citations omitted).

Here, the trial court allowed Mr. Guin's testimony, commenting on the nature of the testimony and also reasoning that weather conditions would cause a later start after jury selection. The court also indicated that defense counsel would have time to talk to an investigator, tell the court his needs, and, he could determine the start time for trial the following day. Thus, it is possible that trial

26

counsel did, in fact, have time to investigate the matter. It is also possible that trial counsel chose not to ask for a continuance for some other tactical reason. Accordingly, it is not possible, based on the record before this court, to determine whether trial counsel's failure to ask for a continuance constituted ineffective assistance of counsel:

> Decisions relating to investigation, preparation, and strategy require an evidentiary hearing and cannot possibly be reviewed on appeal. Only in an evidentiary hearing in the district court, where the defendant could present evidence beyond that contained in the instant record, could these allegations be sufficiently investigated. Accordingly, the defendant's claims of ineffective assistance of counsel will be relegated to post-conviction relief.

*State v. Mitchell*, 13-426, pp. 28-29 (La.App. 3 Cir. 11/6/13), 125 So.3d 586, 605, *writ denied*, 14-102 (La. 6/20/14), 141 So.3d 807. Similarly, here, we find that the defendant's ineffective assistance of counsel claim in this assignment of error should be relegated to post-conviction relief.

*State's Exhibits Eight and Ten*

The defendant asserts that he was denied effective assistance of counsel due to his trial counsel's failure to object to the introduction of State's Exhibits Eight and Ten. State's Exhibit Eight is a photograph of a small drawer containing toys and an empty bottle of prescription hydrocodone prescribed to the defendant. State's Exhibit Ten is a photograph of a .25 caliber pistol with a magazine containing two rounds. The pistol was located in the drawer of an end table next to the couch. Both photographs were introduced into evidence without objection by defense counsel. Appellate counsel contends that defense counsel was ineffective for failing to object to these photographs as they were only

27

admitted to suggest that the defendant is a bad person and, thus, likely to commit the crimes for which he is charged.

Even if the defendant can prove that the photographs were inadmissible and should have been objected to by defense counsel, appellate counsel fails to show that the defendant was prejudiced by the alleged error, pursuant to *Anderson*, 116 So.3d 1045. The offense at issue involved physical abuse to the victim that caused her death. There were no allegations that the victim was shot or that the victim's death was caused by prescription medication. The coroner's report conclusively established that the victim's death was caused by physical injuries, and the issue at trial was simply the identity of the perpetrator. As discussed in the sufficiency analyses, there was ample evidence to support the jury's verdict without considering State's Exhibits Eight and Ten. Thus, the defendant fails to show that, even if trial counsel had objected and successfully prevented the admission of the photographs, the jury's verdict would have been different. Accordingly, this assignment has no merit.

*Voir Dire*

Appellate counsel contends that the defendant was denied effective assistance of counsel by his trial counsel's failure to question any of the prospective jurors during his *voir dire* examination. The record reveals that during the *voir dire* examination, defense counsel addressed the prospective jurors as a whole, explaining to them the State's burden of proof, the fact that a co-defendant had been charged, the law of principals, and the law of reasonable doubt. Defense counsel did not individually question the prospective jurors. During the selection process, defense counsel exercised peremptory challenges to strike certain jurors.

28

Defense counsel's decision not to question the prospective jurors individually could have involved a matter of trial strategy, which must be explored in an evidentiary hearing and cannot be reviewed based on the record before this court. *See State v. Camp*, 46,052 (La.App. 2 Cir. 3/16/11), 59 So.3d 548, *writ denied*, 11-954 (La. 12/16/11), 76 So.3d 1199. Accordingly, this allegation should be relegated to post-conviction relief where a full evidentiary hearing may be held.

*Responsive Verdicts*

The defendant asserts that he was denied effective assistance of counsel by his trial counsel's failure to mention or discuss any of the responsive verdicts during closing argument. Rather, trial counsel argued that the defendant was not the person who committed the offenses. The record reveals that the trial court did instruct the jury as to the responsive verdicts of manslaughter, negligent homicide, and attempted obstruction of justice. Additionally, these responsive verdicts were listed on the verdict forms given to the jury. Thus, the only error of which the defendant complains is his trial counsel's failure to include any discussion of the responsive verdicts during closing argument. In *State v. Smith*, 43,291, pp. 13-14 (La.App. 2 Cir. 8/13/08), 988 So.2d 861, 869, the second circuit found that a similar ineffective assistance of counsel claim involved a strategy-based decision that did not rise to the level of ineffective assistance of counsel:

> The defendant contends that defense counsel at trial was ineffective for failing to argue that, at most, the facts of this case proved attempted aggravated arson and that, since this was a non-responsive offense to aggravated arson, the jury should have been instructed to acquit the defendant. It appears from this record that defense counsel at trial made a strategy-based decision to concede that an aggravated arson occurred, but argued that the defendant did not commit the offense. Such a

29

strategy decision in this matter does not rise to the level of ineffective assistance of counsel.

Likewise, here, it is apparent from the record that Mr. Harris' trial counsel made the same strategy-based decision to concede that a second degree murder occurred, but that the defendant did not commit the offense. As for obstruction of justice, trial counsel argued in the opening statement that the defendant did clean up the area upon discovering that the victim was dead but did so because he was not thinking clearly. Accordingly, we find, as did the second circuit, that such a "strategy decision" does not establish ineffective assistance of counsel. This assignment of error has no merit.

*Cumulative Error Claim*

In this final assignment of error, the defendant asserts that the cumulative effect of the errors committed by his trial counsel denied him the right to effective assistance of counsel. Regarding a "cumulative error" claim where the individual assignments of error are found to be without merit, the supreme court has maintained that "the combined effect of the incidences complained of, none of which amounts to reversible error [does] not deprive the defendant of his right to a fair trial." *State v. Draughn*, 05-1825, p. 70 (La. 1/17/07), 950 So.2d 583, 629, *cert. denied*, 552 U.S. 1012, 128 S.Ct. 537 (2007) (citations omitted).

Applying this same reasoning to the defendant's ineffective assistance of counsel claims, none of the claims individually have merit based on the record before this court. The claims either lack merit or must be relegated to post-conviction relief. Thus, the combined effect of the alleged ineffective assistance of counsel claims, none of which amounts to reversible error, is that Mr. Harris was not deprived of his right to a fair trial. Accordingly, this assignment lacks merit.

30

## V.

## <u>CONCLUSION</u>

Based upon the foregoing, we find no merit in the defendant's assignments of error regarding sufficiency of the evidence, and we affirm his convictions and sentences for second degree murder and obstruction of justice. We further find that the defendant's claims of ineffective assistance of counsel as to his trial counsel's failures to move for a continuance and to question jurors during *voir dire* are to be relegated to post-conviction relief. We find no merit in his remaining assignments of error.

**CONVICTIONS AND SENTENCES AFFIRMED.**