# STATE OF LOUISIANA

## COURT OF APPEAL, THIRD CIRCUIT

### 15-393

STATE OF LOUISIANA

VERSUS

DOMINIQUE JACKSON

************

**APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, DOCKET NO. 12-K-1544-A
HONORABLE JAMES P. DOHERTY, JR., DISTRICT JUDGE**

************

**JAMES T. GENOVESE
JUDGE**

************

Court composed of James T. Genovese, Shannon G. Gremillion, and Phyllis M. Keaty, Judges.

**AFFIRMED.**

**Edward J. Marquet
Louisiana Appellate Project
Post Office Box 53733
Lafayette, Louisiana 70505-3733
(337) 237-6841
COUNSEL FOR DEFENDANT/APPELLANT:**
    Dominique Jackson

**Earl B. Taylor**
**District Attorney—Twenty-Seventh Judicial District**
**Jennifer M. Ardoin**
**Assistant District Attorney**
**Post Office Drawer 1968**
**Opelousas, Louisiana 70571**
**(337) 948-0551**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**GENOVESE, Judge.**

In this criminal case, Defendant, Dominique Jackson, was found guilty by jury verdict of the second degree murder of Derrion Sam, a juvenile under the age of twelve. He has appealed his conviction, alleging insufficiency of the evidence. For the following reasons, we affirm Defendant's conviction.

## FACTS AND PROCEDURAL HISTORY

Two-year-old Derrion Sam died as a result of a transecting duodenal perforation after being in the care of Defendant. Defendant was indicted for the first degree murder of Derrion Sam, a juvenile under the age of twelve. The jury returned a responsive verdict of second degree murder, a violation of La.R.S. 14:30.1. Defendant was sentenced to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find no errors patent.

## ASSIGNMENT OF ERROR

Defendant argues that the State failed to exclude every reasonable hypothesis of innocence and that the circumstantial evidence was insufficient to sustain a conviction for second degree murder.

Defendant argues in pertinent part (record references omitted):

> As acknowledged by the prosecution, there existed no witnesses to the event that caused the death of [Derrion Sam] on or about December 19, 2011. The uncontroverted medical testimony established that the child arrived at the hospital with no pulse and not breathing. Dr. Nicholas Fruge was the ER treating physician and testified that the traumatic event that caused [Derrion Sam]'s death more likely than not occurred [five] or [six] hours before presentation

at the hospital at 11:04 a.m. on December 19, 2011. He believed that the child was "absolutely" dead on arrival at the hospital and [that the] child had been dead for an hour or two before arrival at 11:04 a.m.

Latricia Hunt, mother of [Derrion Sam], testified that she arrived home from work on December 18, 2011[,] around 10:20 p.m.[,] and [Derrion Sam] was awake. [He] wasn't able to keep down fluids or food. [Derrion Sam] slept comfortably through the night. Dominique Jackson had a job interview on the morning of December 19, 2011[,] and left the house sometime around 9:00 a.m.

Based on the medical testimony, if the trauma occurred on the afternoon of December 18, 2011, [Derrion Sam] could not possibly have survived through the night. [He] rested comfortably and was communicative with Latricia Hunt the morning of December 19, 2011. The defendant had left by 9:00 a.m. or so[,] and Latricia Hunt was alone with [Derrion Sam] for about [two] hours before [he] was brought to the hospital at 11:04 a.m.[,] at which time he was lifeless and without pulse.

No one testified that throughout the night of December 18th and into the morning hours of December 19th that any trauma was inflicted upon [Derrion Sam] by Dominique Jackson. Dominique Jackson and Latricia Hunt were together with [Derrion Sam] from about 10:00 p.m. on December 18th until 9:00 a.m. on December 19th. Latricia Hunt is alone with her child [Derrion Sam] from 9:00 until about 11:00 a.m.

No explanation was provided to the jury when Dominique Jackson exerted the tremendous force necessary to transect [Derrion Sam]'s duodenum. However[,] as a matter of medical impossibility according to Dr. Fruge, it could not have occurred on December 18th when [Derrion Sam] was in the care of Dominique Jackson. Based on Dr. Fruge's estimation[,] it certainly could have occurred between 9:00 a.m. and 11:00 a.m. on December 19, 2011[,] when [Derrion Sam] was in the sole care of Latricia Hunt.

When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing the sufficiency first is that the accused may be entitled to an acquittal under *Hudson v. Louisiana*, 450 U.S. 40, 101 S. Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed. 2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. *State v. Hearold*, 603 So. 2d 731 (La. 1992).

The law of circumstantial evidence requires that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must **exclude** every reasonable hypothesis of innocence (emphasis added)."

The State responded, arguing in pertinent part:

Defendant seems to suggest that the timeline provided by the experts puts [Derrion Sam] in the control of both Defendant and Ms. Hunt at the time his injuries occurred. First, the testimony of both experts was that the timeline was not an exact science because the death was not instantaneous. Second, Ms. Hunt testified that the injuries causing death occurred while [Derrion Sam] was in the care of the Defendant while she was not present. There was no testimony that the mother ever abused and/or injured [Derrion Sam]. Lastly, even if the jury were to consider that the mother was present at that the time the injuries occurred, which the State contends was not the case, the Defendant would still be a principal to the crime. It is the role of the factfinder to judge the credibility of witnesses' testimony. The jury was present for the presentation of all evidence and testimony and found the State's witnesses, including Ms. Hunt, to be credible.

In *State v. Small*, 46,632, p. 8 (La.App. 2 Cir. 11/16/11), 78 So.3d 825, 830-31, *writ granted on other grounds*, 11-2796 (La. 10/16/12), 100 So.3d 797, the court addressed the elements involved in the offense of second degree murder by means of cruelty to juveniles, stating:

In order to prove that defendant committed second degree murder, the state had to show, *inter alia*, that defendant was committing either second degree cruelty to juveniles or cruelty to juveniles when the child died, and a legal causation between the underlying felony, cruelty to juveniles, and the child's death.

In this case, Ronetta Sam, the aunt of Derrion Sam, testified that she picked Derrion up at his mother's home and brought him to his maternal grandmother's home on December 8, 2011. She stated that she saw a bruise on Derrion's forehead and scratches on his face. When Derrion's grandmother asked him what had happened, Derrion stated that Defendant hit him twice in his head. Ms. Sam and her mother kept Derrion from December 8 to December 12. During that time,

3

Ms. Sam recalled that Derrion did not eat or drink very much. She testified that Derrion sucked on an ice cream bar, ate some candy, and drank some juice.

Latricia Hunt, Derrion's mother, testified that she began dating Defendant in the summer of 2011 when Derrion was two years old and that they had lived together off and on. Ms. Hunt stated that during the time she was dating Defendant, Derrion was hurt on two different occasions. She explained in pertinent part:

> Q. Do you have any -- were you aware of any point in time when Derrion hurt that area of his body?
>
> A. I was at work[,] and I got off[,] and Derrion was left with Dominique[,] and Dominique said that they went to his aunt's house in Opelousas and [that] a little boy was on a swing. It's a tire swing tied to a tree[,] and he said that Derrion walked into the -- in the front of the swing[,] and the little boy hit him.
>
> Q. Okay, and so did he have any bruising around his rib area?
>
> A. I brought him to the hospital. They said he had, uh, bruised ribs and he was a little shaken up[,] but he was going to be okay.

There was also an occasion when Derrion had burns on his hand. Ms. Hunt explained the burns to Derrion's hand, stating in pertinent part:

> A. In Dominique's care. Uh, I was at work -- well, no, the burn, I went to the hospital. My brother was having a baby[,] and I started cooking some food. It was a stew[,] and I left the food for Dominique to finish it[,] and I got to the hospital[,] and I called after a while and -- just to see what they were doing[,] and he said that Derrion was reaching for his bowl and [that] the pot boiled over and burned his fingers.

Ms. Hunt testified that Defendant did not have a job and that he would babysit Derrion while she was at work. She stated that she and Defendant were not getting along in the days leading up to Derrion's death. She testified that Defendant drank, that he would fight with her, and that he was sleeping around

4

with other women. She also stated that she had previously thrown him out of her apartment.

Ms. Hunt stated that Defendant came over the morning of December 18, 2011, and she asked Defendant to keep him that day. Ms. Hunt testified that Derrion was normal that morning and that she went to work around three or four p.m.

Evelyn Gladney, Defendant's mother, testified that Ms. Hunt called Defendant on December 18, 2011, and asked him to keep Derrion for her that evening. She stated that she brought Defendant to Ms. Hunt's home around 4:30 p.m.

The record reveals that the night Defendant was keeping Derrion, he contacted Ms. Hunt while she was at work. He had her cell phone at the time and became upset when Ms. Hunt's old friend (Donte) called on her cell phone. Ms. Hunt explained in pertinent part:

> A. Yeah, Dominique called me[,] and he said, uh, "Your boyfriend called," and I was like, uh, "What -- what are you talking about?" He said, "Well, I'm not tripping. We're just gonna talk about it when you get home," sounding calm like -- like nothing was wrong[,] so what I did, I went in the restroom at Walmart[,] and I called Donte[,] and I was like, "Call him and let him know, you know, we have nothing going on, we just friends," and he said, "I told him that and he was enraged." He wanted to fight him, asking him, "Where you at," you know, like mad, wanting to fight him[,] so, uh --
>
> Q. So he told you he wasn't tripping?
>
> A. Yeah.
>
> Q. Okay, did you ask him about how Derrion was doing?
>
> A. Uh, yeah, I said, "Where's my baby," and he was like, "He's right there," like still calm. I said, "'Cause[,] if it's a problem[,] you can take my phone and my baby and bring them to my cousin until I get off." He was like, "No, it's not a problem. We just going to talk about it when you get home," and we hung up[. . . . ]

5

Ms. Hunt returned home from work around 10:15 to 10:20 p.m. Derrion was sitting in a rocking chair, and Defendant was in the kitchen cooking. Then, the following pertinent exchange occurred while the State questioned Ms. Hunt:

Q. Okay, so once you get home[,] Derrion is sitting up or laying down?

A. He's like kind of balled up into the rocking chair[,] and I opened the door[,] and he's like, uh --

Q. So he's upright?

A. Ma'am?

Q. Derrion was upright?

A. Yes, ma'am.

Q. Okay, all right.

A. So he said, uh -- the first thing he said was, "Ask Derrion what's wrong. Watch, he's gonna --"

Q. Who says that?

A. Dominique.

Q. He tells you, "Ask Derrion what's wrong?

A. "Ask Derrion what's wrong. Watch, he's going to point to his stomach," and I asked him what's wrong[,] and he kind of, you know, he didn't really want to talk[,] so I called my aunt, Derrion's grandmother -- godmother[,] and I said, "Well, Dominique told me that Derrion -- he took him playing on the basketball court that day[,] and he was normal[,] and he said all of sudden, like, he wasn't keeping any foods down." He said -- I think he said he tried to give him some wieners or something[,] and he end up throwing it up[,] so he was like, "He's not keeping any foods down," so --

Q. Did he say on the basketball court -- did they play when it was daylight?

A. I'm guessing, yeah.

Q. Did he say that there were any trouble or problems when they playing basketball?

6

A. No, ma'am.

      . . . .

Q. At any time did he like jump down and run around or do anything like that?

A. No.

Q. Did he get up at all, I guess out of your hands and did he --

A. Yeah, on his own, yeah.

      . . . .

Q. Did you give him some liquids?

A. Yes, ma'am, I gave him a, uh, Capri Sun.

Q. Did he drink it?

A. Yes, ma'am.

Q. Did it stay down?

A. That night he threw up.

      . . . .

Q. Did you put him in his own bed that night?

A. Yeah, and he woke up crying in the middle of the night[,] and I got Dominique up, I said to go and, uh -- go and get him[,] so he went and, uh -- and got Derrion[,] and he put him in the bed beside us.

Q. Okay, so he was in between you?

A. Yeah.

Q. Okay, did he sleep the rest of the night?

A. Yes, ma'am, he actually -- yeah, he slept comfortable actually.

Q. Did you touch him to see if he was not feverish or anything?

A. Uh, he didn't seem warm at the time.

Q. Okay, so the next morning -- you said he slept -- so he slept through the night?

7

A. Yes, ma'am.

Ms. Hunt testified that Defendant left early in the morning for a job interview; she believed it was around 9:00 a.m. She stated that when Derrion woke up the next morning, he asked for something to drink. She got him a Capri Sun, which he drank, but he threw it up. Ms. Hunt testified that Derrion did not seem right, so she called her cousin to see if she could take them to the hospital. Ms. Hunt testified that, when she brought Derrion to his room to get dressed, he did not want to stand on his own. When her cousin arrived, she carried him to the car. She recalled that he was responsive, but only grunting. Ms. Hunt stated that as soon as they got to the hospital, Derrion's eyes rolled back, and he was then unresponsive.

During direct examination, the following pertinent exchange occurred:

Q. And you had no information whether he was hit in that area or not?

A. No, ma'am.

Q. Have you ever known him to be hit in that area any kind of way at all?

A. No, ma'am. Just the swing incident and, you know, I didn't even see that so I don't know where he got hit.

On re-direct examination, Ms. Hunt testified that no one else had access to Derrion other than Defendant. When asked what she thought happened to Derrion to cause the injury, she responded, "He was left in Dominique's care. I don't know what happened that day. . . . I don't think I'll ever know." When asked if she continued to live with Defendant after Derrion passed away, Ms. Hunt responded as follows:

A. Yes, ma'am, and he was aware. He kept me close[,] and he was aware of everything that was going on until my family told me, "You need to get away from him," and he started flipping out saying, "You dumb B, that's why that child died. This one's gonna die, too," while

I'm pregnant with his kid and I -- I went to the cops[,] and I showed them the text messages that he was sending.

Ms. Hunt's cousin, Tiffany Hunt (Tiffany), testified that on the morning of December 19, 2011, she took Ms. Hunt and Derrion to the hospital. Tiffany stated that when she first arrived at Ms. Hunt's home, Ms. Hunt was holding Derrion in her arms. Tiffany stated in pertinent part:

A. Then it's whenever I got his head -- I touched him[,] and I made him look at me[,] and he looked at me[,] but he couldn't keep his eyes focused on me[,] so they were kind of like drifting.

Q. He's [sic] eyes wouldn't stay on you?

A. Not all the time, no, ma'am.

Q. Okay, do you know if he was cool to the touch?

A. Not to my knowledge.

Q. Okay, and did he -- so he didn't -- did he appear alert?

A. He was responding.

Q. Okay, so he's responding[,] and that's a word[,] and I'm just going to have to get into what does that mean to you. So[,] he was saying, "Uh-huh["?]

A. Whenever I would say something he would --

Q. He would murmur something back?

A. Yes, ma'am.

Q. But he wasn't --

A. But he could not say "yes" or "no." He wasn't doing that at the time.

. . . .

Q. Okay, so once you go there -- were y'all talking to him on the way to the hospital?

A. Yes, ma'am.

9

Q. Okay, and was he still kind of -- kind of making noises back at you when you're asking him questions?

A. Yes, ma'am. She was asking -- well, she did ask him. She asked him if he was hurting[,] and he said, "Uh-uh," and she was like, "I love you. You love momma?" And he was like, "uh-huh," and she was like, you know, "You're going to be okay," so then I touched him and I was like, "He probably just needs fluids, you know. He's weak. You said he had been throwing up. He'll be okay." So[,] as I'm driving, uh, me and her were talking for maybe two minutes[,] and then she started to respond -- to call his name again[,] and then he didn't respond[,] and then she called it again[,] and he did not respond[,] and then she started screaming.

Q. Was this in your car?

A. Yes, ma'am. "Tiffany, he's dead," and I'm like, "Girl, stop that, he's not dead," you know, and so she still was screaming[,] so I'm trying to calm her down as I'm driving. I'm like -- so then I kind of looked up to him -- looked toward him[,] and his little eyes were just rolled. They were just there, nothing.

Tiffany also testified as to what Ms. Hunt told her about Derrion's illness, stating

in pertinent part:

A. Well, she told me that night, the night that he was -- when she got home[,] how he was throwing up and everything[,] and he wasn't feeling good[,] and how she gave him some Pepto[,] and how he slept with her and that he ran a fever and everything[,] but then she said, you know, the next day[,] he was just looking so weak[,] and he wasn't acting his normal self[,] so[,] when she did call me, she said, uh, that he hadn't too long just [sic] -- like, he was just laying there, like she had to pick him up that morning, like he didn't want to go to the bathroom by himself, like she had to basically lift him and carry him and everything. You know, when she called me and was like, "He's just laying there." I was like, "What you mean?"

Q. So[,] she picked him up and carried him to the bathroom for him to use the bathroom?

A. 'Cause [sic] she said she was picking -- she was holding him 'cause he didn't want to walk.

Q. And then[,] she had to carry him or whatever to put him on some furniture or something to watch TV or whatever?

A. She was holding him, uh-huh.

Q. And she said he had been like that all morning?

A. That morning, like once she got up.  He was sleeping[,] and[,] apparently[,] she woke him up because he was just still sleeping and feeling bad 'cause [sic], I mean, that's what she told me[,] so she just held him.  Now, how long -- you know, I guess that morning[,] like once he woke up, that's what she had to do, just hold him and bring him wherever because[,] when I got there[,] she was still holding him.

Q. And she had him dressed ready to go to the hospital?

A. He had on a shirt and his little, uh -- I think maybe some shorts or something[,] but he was -- he was ready to go.

Dr. Nicholas Fruge, an emergency room (ER) doctor at Opelousas General Hospital, was accepted by the trial court as an expert in emergency room medicine.  He testified that on December 19, 2011, he was working in the ER at Opelousas General Hospital.  The ER report, which was admitted into evidence, indicated that Derrion was two years old at the time he was seen.  Dr. Fruge stated that Derrion arrived in the ER around 11:04 a.m. and that, when the child arrived, he was not breathing and did not have a pulse.  He was of the opinion that Derrion was dead when he arrived.  In an attempt to resuscitate the child, intravenous medication was given and an intubation tube was inserted.  Dr. Fruge testified that the child was revived for five to ten seconds.  He further described Derrion as "pale, cool to the touch, listless, floppy, pupils dilated, unreactive."

When asked about the cause of death indicated in the autopsy report, Dr. Fruge testified, in pertinent part:

Q. The final autopsy conclusion was that the duodenum had been transected.  Tell us, have you ever seen that before?

A. Never.  That's a terribly traumatic blow.

Q. It really takes a lot of force to do that?

A. Yes, sir.

11

Derrion's mother gave a history to the registered nurse on duty in the ER. This history was indicated in the notes reviewed by Dr. Fruge. The notes were read by the State to Dr. Fruge. The notes stated as follows: "Yesterday at dad's home began with vomiting, diarrhea. Arousable this a.m., this morning, was verbal and had not eaten. Mom brought the child to ER for decreased response. Child limp, unresponsive upon arrival to triage desk. CPR initiated." Dr. Fruge was questioned as to whether or not he observed any rigor mortis at the time the victim was presented at the ER. He responded, in pertinent part:

Q. You didn't observe any rigor mortis, did you?

A. No, sir.

Q. And what's your experience in rigor mortis? Doesn't it take about three hours or so to set in?

A. Rigor mortis is going to usually take six to eight [hours.]

Dr. Fruge estimated the time of the injury to the child at five to six hours before his arrival at the hospital. He was of the opinion that eight to ten hours would be the utmost time from the initial onset of trauma.

Robert Fontenot, a registered nurse at Opelousas General Hospital, was on duty in the ER on December 19, 2011. Mr. Fontenot testified that he took Derrion's temperature rectally with a digital thermometer around 11:04 a.m., and it registered 93.3 degrees Fahrenheit.

Dr. Christopher Tape, a forensic pathologist, was accepted by the court as an expert. He stated that he conducted an autopsy on Derrion on December 20, 2011. Dr. Tape testified that the primary cause of Derrion's death was transecting duodenal perforation, secondary to blunt force injuries to the body. Dr. Tape testified in pertinent part:

A. The primary cause of death was what I call a transacting duodenal perforation secondary to blunt force injuries to the body[,] which just means the intestine right outside the stomach was completely torn.

Q. And you said "blunt force." Explain that, what you mean by that.

A. All injuries or trauma can be divided roughly into blunt force and sharp force. This is a blunt force where you -- you hit with a blunt force object and not a sharp force, not a sharp instrument.

Q. So[,] the stomach was actually pulled apart?

A. I shouldn't have used that term. It was transected. I'm not sure[,] [i]t's -- when I found it, it wasn't separated.

Q. Okay, all right, and how did that cause death? You heard my bad attempts at trying to explain it.

A. This is a little bit complex mechanism of death. Really, we deal with the cause of death, the underlying cause of death. The mechanism of death can be a little bit complex. It's usually always a failed arrhythmia. It's just kind of a cop out. It just means that he had a heart attack[,] but did you have a heart attack, that arrhythmia? In this case, you had to consider what's outside of your body goes in your mouth[,] and it basically continues through your body. That's basically outside[,] and it should be in your body. Whenever you have a tear anywhere in your intestines, for whatever reason, that intestinal liquid and fluid comes out. There was blood and fecal material in the abdominal cavity. That has acid in it. It has bacteria in it. It has basically -- it's sort of a chemical soup that's not supposed to be there. It's directly battling, among other things, your kidneys, the outside of your intestines, your spleen, your adrenals, your liver, and that acid and that fecal material on the intestines itself is not good for you. It's basically shutting down the body. When you hear about -- this is called -- when you have a perforation, what happens is you get air within the abdominal cavity. It's called free air[,] and they see it on x-ray. This is an emergency. If you talk to a doctor and you say -- an ER doctor or a surgeon [--] and you say, "They found free air on the x-ray," that's a medical emergency, a surgical emergency. They need to bring that child into the -- into the OR and fix that child.

Again, getting to the exact mechanism of why they die from that, it's a little more complicated[,] and it's probably a combination of all of those things.

. . . .

Q. Now, you said there was a -- when you opened the child up, did you see a bruise?

13

A. Initially, I do an external autopsy[,] meaning I look at the body first of all. We take pictures. I did notice in this case there was a bruise to the right of the bellybutton. We reflect --

Q. On the outside?

A. On the outside I noticed that. When I reflected the skin, I noticed --

Q. When you say that[,] you mean you opened the skin?

A. That's right[;] so[,] I make a cut, a Y shaped incision on the body[,] and I reflect the skin so it's basically skin and muscle[,] and you can see sometimes a bruise, for whatever reason, might be deep or hasn't developed all the way to the surface. You don't see it on the surface[,] but[,] when you reflect the skin[,] you see hemorrhage within the muscle[,] so I saw additional hemorrhages on the left side of the abdomen that I couldn't see on the surface. Additionally, I had made cuts on the back, an incision on the back. I opened up the skin on the back[,] and I found two other small muscle hemorrhages that I didn't notice on the surface of the body.

Q. And how many were there all together? How many -- how many bruises? I'm going to call them bruises.

A. So[,] there's the contusion I see to the right of the bellybutton that's four by three centimeters[,] and an inch is about two and a half centimeters. That gives you an idea. On the left upper quadrant of the abdomen, there's two, one is 1.5 centimeters and one -- they're each 1.5 centimeters. Excuse me, I take that back. There's one on the right, there's one on the left that's 1.5[,] and there's two on the back[,] and those are each one centimeter[;] so, again, one on the right, four by three, one on the left that's 1.5[,] and two on the back, on the left lower hip back area, measuring one centimeter.

. . . .

Q. Okay, what about the separation of the duodenum?

A. That's substantial force.

Q. That takes a lot of force?

A. Yes.

Q. That's not for a tripping and falling, a kid tripping and falling on the playground?

A. Not unless they had a significant fall with it. I mean, falling down a long flight of stairs perhaps[,] but it would be unusual.

Q. Were these consistent with blows to the body by a fist or a hand?

A. Yes.

Dr. Tape also found rib fractures, which he estimated some were one to three weeks old and others were three to six weeks old. Dr. Tape ruled the death was a homicide. During cross-examination, the following pertinent exchange occurred:

Q. Dr. Tape, as to the blunt force trauma and the duodenal perforation, is that -- is blunt force trauma the only way that can -- that can occur in a child or are there other circumstances where it can occur?

A. You could be stabbed and perforated[,] but you'd see a stab wound. You could be shot and perforated[,] but you'd see the shot. To actually tear like that or to be completely transected, sometimes you can [sic] ulcers and you get a perforation and you get a hole[;] but[,] to be completely transected like that is -- is -- that's blunt force trauma[.] [A]nd one of the things that we haven't mentioned is the way the duodenum is coming[.] [W]here this injury happened, it comes from your stomach, down the left stomach, and then goes from your stomach kind of behind your liver[,] and then comes up and around right over your backbone here[,] and it's kind of vulnerable at that spot. It's connected by the ligament of treitz[,] and[,] normally[,] your intestine can kind of move around and get out of the way. If you hit somebody in the stomach, your intestine will get out of the way[;] but[,] the ligament of treitz, it will rip and it will tear the intestine there. You can have this from a car accident[,] but that's also blunt force injuries[,] and you see other injuries on the body[,] and you have a history of a car crash with the front end destroyed type of thing.

. . . .

Q. And you make the conclusion that indicates the injury likely occurred at least 24 hours prior to death, at least 24 hours prior to death; is that right?

A. That's what I say. That's likely. That's the language I use because I don't think this is an instant thing. It had to take time to develop.

Q. It had to take time to develop to start affecting that child's system in a negative way, right?

A. That's correct.

Q. It had to take time to create a fever?

A. That's correct.

15

Q. It had to take time to create some symptomatic -- some symptoms as far as vomiting or not feeling well and abdominal pain, correct?

A. That's correct.

Q. The temperature of the body. The temperature of the body, is there a formula that you utilize or that you know there to exist in your profession that the body cools at a certain rate whereby allowing you to calculate how long somebody may have been deceased?

A. There are some. They're very complicated calculations. You can simplify it making some assumptions assuming that the body was normal to begin with, assuming that it's roughly room temperature. The body cools about one and a half degrees per hour. To be more specific, it matches the environmental temperature[,] and it starts to cool a little bit slower after a while[,] but one and a half degrees per hour is a -- is a proximation that can be used.

Q. And in reference to your report, do you recall what the temperature was on the child's -- on the child's delivery to the hospital?

A. 93.3 [degrees] Fahrenheit.

Q. And is there a way you can do the calculation that would show what that child's temperature was -- how long it took that child to die before?

A. I can give you calculations that will help us give a range. If you use the one and a half degrees per hour and you see a five degree temperature change, because we went from 98.6 to 93.3, it's actually a little more than five degrees[;] but[,] five degrees to make the math a little easier, if you assume a degree and a half per hour, that's three and a half hours.

Q. Three and a half hours.

A. If you do another calculation and you say, "Well, maybe it was fast cooling -- excuse me, slow cooling," maybe a degree per hour, that gives you five hours. Maybe it's a little bit faster, two degrees per hour, that gives you two and a half hours. Maybe it's really fast cooling, two and a half degrees per hour, that would give you two hours[;] so[,] that gives you a range and also so of [sic] an average a little bit.

. . . .

Q. Now, you said anything is possible as to the -- you made the comment earlier that anything is possible[,] but I want to particularly go back to the transecting duodenal perforation secondary to blunt

16

force injuries to the body.  You said, based on your science, based on your experience and everything that you do, that at a minimum[,] it was greater than 24 hours prior to the child's death, at whatever time that may have fallen, correct?

A. Putting all the pieces together, that's my best conclusion, yes.

On redirect, Dr. Tape explained in pertinent part:

Q. The 24 hour time period, that's a guess; is it not?

A. It's a guess based on sort of the circumstantial evidence and the autopsy findings and the fact that, again, you don't die instantly.  This is not instantaneous death.

Q. Could it be ten hours?

A. Sure, anything, you know, there's going to be a range.

Q. Well, give us the range.  I mean, you picked 24[,] but give us the range that you think[.]  [B]ased on what you saw, what is the range?

A. One of the reasons I said 24 hours is because he was experiencing symptoms that are consistent with that of not eating or drinking[,] and[,] when your intestines do this, they shut down.  You do not eat or drink.  You don't touch anything.  That's my interpretation of the clinical circumstances[;] and, again, I'm relying on that[,] but I'm putting it all together and coming up with the best conclusion.

A summary of the autopsy report, which was admitted into evidence as State's Exhibit 1, provided in pertinent part:

**CIRCUMSTANCES/COMMENT:**

The decedent was a 2½ -year-old black male child who was brought to the ER by his mother in cardiac arrest.  She states that he had a runny nose for approximately 2 days prior to death[,] and[,] the night before[,] felt as if he had a fever[,] but no temperature was taken.  She said he had abdominal pain and had vomited once[,] and she gave him Pepto-Bismol approximately at midnight.  He slept with his mother and awoke around 9 a.m.[,] but would not eat.  At approximately 10:30 a.m.[,] the mother noticed him not responding and limp[,] and the mother called a cousin to bring them to the hospital.  They noticed the decedent not breathing approximately 2 blocks from the hospital.  When he got to the hospital[,] his skin was cold to the touch with a rectal temperature of 93.3 and a capillary blood glucose of 33 mg/dL.  Resuscitation efforts were unsuccessful[,] and he was pronounced

[dead] at 11:42 a.m. The only known history is a burn from hot grease on his right hand.

The primary finding at autopsy is a transecting duodenal perforation at the ligament of Treitz with blood and fecal material within the abdominal cavity. There are external injuries including a contusion of the right abdomen, soft tissue hemorrhage in the muscle of the left upper quadrant of the abdomen, and two on the left lower back. In addition, there are mesentery hemorrhages and serosal hemorrhages of the jejunum and hemorrhage in the left adrenal gland. There are remote rib fractures on the right, 7 and 9, with hemorrhagic calluses, and on the right, 10-12, with non-hemorrhagic calluses. There is a renal vein thrombosis on the left[,] but[,] otherwise[,] no natural disease is present. There is de-pigmentation of the fingers of the right hand corresponding to a healing burn. Toxicology is negative.

A transecting perforation of the small intestine in this area is common secondary to blunt force injuries to the body, as the small intestine is coming over the spine in this area. Given the evidence of the soft tissue body hemorrhages, as well as the healing rib fractures, the most likely cause of death is a traumatic duodenal perforation secondary to blunt force injuries to body with the manner being homicide. The clinical history of being sick for a few days[,] and not eating for at least the day of his death[,] and vomiting the prior day with a low capillary blood glucose level indicates that the injury likely occurred at least 24 hours prior to death. The temperature of the body upon arrival to the ER suggests that the decedent was dead for perhaps a few hours before being brought in. The remote rib fractures, two with hemorrhages and three without hemorrhages[,] indicate at least two prior injuries. These fractures are likely non-accidental and probably occurred days or even weeks before the blunt force injuries to the body that caused the transecting duodenal perforation. The renal vein thrombosis is likely due to the injuries, coupled with possible venous stasis due to immobility or decreased mobility secondary to injuries.

Dr. Richard Howes, a professor of clinical pediatrics at LSU Medical School, was accepted by the court as an expert in pediatrics and child abuse and neglect. Dr. Howes testified in pertinent part:

Q. [D]o you agree with Dr. Tape's analysis of the two sets of broken ribs, the one that he said was -- you did not hear Dr. Tape's testimony . . . .

A. It would be relatively recent. They certainly did not occur at the time of the other injuries to this child. It would have had to occurred at least five to seven days prior to that, yes.

18

Q. Okay, and also, the second one, right ten, eleven and twelve, calluses without hemorrhaging, he said that was even further, more remote from the duodenal transection.

A. Absolutely. This definitely indicates that there were rib fractures on at least two occasions and at least five to seven days prior to the death of the child.

Q. Okay, so what we have is rib fractures five to seven days on the first set[,] and how much earlier do you think the second set that wouldn't have no calluses, in your experience?

A. Well, we know for sure that they occurred after October the 10th or so because the child had a chest x-ray at that time when he had burns to his hands.

Q. Okay.

A. So[,] we know that there were not rib fractures[,] then so they would have had to occur after that[,] but there had been substantial but not complete healing[,] so, you know, probably several weeks beyond the -- the other set.

Q. Okay, so we know that the outside, October what, 10th?

A. Right.

Q. Okay, so we know it was after October the 10th but probably some -- and we know it was before December the 19th.

A. Correct.

Q. Okay, and we have the burns on the hand. I don't know if you saw that. You reviewed the records on that?

A. I reviewed the records on the -- on the burns, yes.

Q. Okay, not counting -- I don't want you to consider the burns on the hand, all right. Do not bring them into your consideration. What conclusion -- but assume that there is a knot, which is maybe some days old, a couple of days old, on the forehead of the child as shown in the photographs 2 A, B and C, the rib fractures that are on the right ten, eleven and twelve[,] and the rib fractures on seven and nine[,] and a transection of the duodenum, would you say this child had been subjected to physical abuse?

A. Yes.

Q. As an expert, do you have any doubt about that?

19

A. No.

Q. Would you say that the transection of the duodenum was -- required a great deal of force to the body of this child?

A. Yes.

Q. Would you say that the rib fractures that are observed on -- in seven and nine with the calluses, did those require a good bit of force?

A. Yes.

Q. Would you say that the rib fractures that you saw on ten, eleven and twelve, would they have required a great deal of force?

A. Yes.

Q. These are not kind of -- you've been a pediatrician for how many years? My math's not very good.

A. I've got to do a little bit of math myself. Since '76[,] so this summer it will be 39 years.

Q. Okay, so -- so 39 years. Well, first of all, have you ever seen a transected duodenum in a child in child abuse?

A. I -- I don't recall specifically[,] but I do think I did see one in the late '70's where a child fatality had the transected duodenum.

Q. Once?

A. Yes.

Q. And how many children do you see, examine, during the course of a year?

A. Several thousand.

Q. Several thousand, okay, and so would you say that that required a good bit of force to cause that injury?

A. Yes, sir.

Q. And as with the broken ribs?

A. Yes.

Q. What about the knot on the head? If -- if that was a blow to the head, would that require some force?

20

A. For a blow to the head like -- yes, that would require some force. It would have been more easily made if the child struck his head on something or he was thrown down and his head hit. To hit a child with your hand and produce that would be unusual. Could occur.

Q. Okay. Now, of course, you're not telling us -- you don't have any idea who did this or how --

A. No, sir.

Q. -- if it was one, two, three, four, five or six people?

A. I don't know.

Q. You do not know. And is there any way to tell, particularly the transection of the duodenum, is there any way to say if it was a fist, a foot, a toe, a heel?

A. It is not possible for that.

Q. No way to do that?

A. No.

On cross-examination of Dr. Howes, the following pertinent exchange occurred:

A. Actually[,] I also looked at chest x-rays from August when the child was in the emergency room for a -- being hit in the abdomen with a swing.

Q. Okay.

A. And[,] at that time[,] there were x-rays taken and no rib fractures identified.

Q. Okay.

A. And then again in October when the child was brought in with burns to his hand after three days[,] and then was hospitalized in a burn unit, his -- x-rays were taken then. I think he had a cough then[,] so it wasn't taken because of suspicion of injuries. It was taken because of his cough[,] but it did not show rib fractures then. I didn't see the x-rays myself. I -- I'm going by reports.

On re-direct examination, Dr. Howe stated that in this kind of case, it would normally be a single perpetrator and, occasionally, another person permitting the abuse to happen.

21

The unrebutted testimony and evidence, which is not challenged by Defendant, clearly indicates that Derrion died as a result of cruelty to a juvenile and that there were only two people who could have possibly committed that offense: Defendant and Ms. Hunt. A review of the record indicates that at trial, Defendant's attorney did not directly implicate Ms. Hunt as the perpetrator. In his opening statement, Defendant's attorney argued there was direct conflict between the experts, the evidence, and Ms. Hunt's testimony. However, on appeal, Defendant argues, "Based on Dr. Fruge's estimation[,] it certainly could have occurred between 9:00 a.m. and 11:00 a.m. on December 19, 2011[,] when D.S. was in the sole care of Latricia Hunt." Thus, there is a question as to whether the hypothesis of innocence that implicates Ms. Hunt as the perpetrator was presented at trial.

In *State v. Taylor*, 14-432, pp. 7-8, (La. 3/17/15), 166 So.3d 988, 993-94 (emphasis added), the court explained in pertinent part:

> The rational trier of fact standard established by *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), preserves "'the factfinder's role as weigher of the evidence,'" by requiring an appellate court to review "'*all of the evidence . . . in the light most favorable to the prosecution.*'" *McDaniel v. Brown*, 558 U.S. 120, 134, 130 S.Ct. 665, 674, 175 L.Ed.2d 582 (quoting *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2781). Preserving the role of the factfinder means that in cases involving circumstantial evidence, when "the jury reasonably rejects the hypothesis of innocence presented by the defendant [ ], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville*, 448 So.2d 676, 680 (La.1984). The alternative hypothesis is not one that merely "*could* explain the events in an exculpatory fashion," but one that, after viewing *all* of the evidence in a light most favorable to the prosecution, admissible as well as inadmissible, "is sufficiently reasonable that a rational juror could not 'have found proof of guilt beyond a reasonable doubt.'" *Captville*, 448 So.2d at 680 (quoting *Jackson*); *see State v. Hearold*, 603 So.2d 731, 734 (La.1992) ("[W]hen the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the accused is not entitled to an acquittal, and the reviewing court must then consider the

assignments of trial error to determine whether the accused is entitled to a new trial."). *Preserving the role of the factfinder by an appellate court also means that a defendant may not "split[ ] alternative and inconsistent defenses in different forums, raising one defense before the jury and when that fails, a second defense presupposing a different set of facts in an appellate court conducting sufficiency review under Jackson and La.C.Cr.P. art 821(E)." State v. Juluke*, 98-0341, pp. 4-5 (La.1/8/99), 725 So.2d 1291, 1293.

The following timeline is based upon the testimony and medical records admitted into evidence at trial:

**Summer 2011** . . . . Defendant and Ms. Hunt began dating and living together on and off.

**August 5, 2011** . . . . Derrion was brought to the hospital. He complained of stomach and rib pain. Ms. Hunt gave a history of Derrion being accidentally hit by a swing while in the care of Defendant. According to the medical records and testimony of Dr. Howes, the chest x-ray did not show broken ribs.

**October 7, 2011** . . . . Derrion was brought to the hospital for a burn to his right hand (2nd degree burn) which happened on October 4, 2011. History from mother said it was a hot grease burn. The chest x-ray did not show any broken ribs.

**November 7 to December 12, 2011** . . . . Dr. Tape testified that Derrion's rib fractures occurred from one to six weeks from the date of his death.

**December 8, 2011** . . . . Ms. Sam testified that Derrion had a bruise on his forehead and scratches on his face. Derrion said that Defendant hit him, but Ms. Hunt testified that Defendant said Derrion hit his head on the wall.

23

**December 18, 2011**:

> **Morning** . . . . According to Ms. Hunt, Defendant arrives at home.

> **11:42 a.m.** . . . . According to Dr. Tape and the autopsy report, the best estimate of when the injury occurred to the duodenum (twenty-four hours before Derrion was pronounced dead at 11:42 a.m.). Both Defendant and Ms. Hunt could have been present.

> **3:00 or 4:00 p.m.** . . . . According to Ms. Hunt, she goes to work.

> **4:30 p.m.** . . . . According to Defendant's mother, she dropped off Defendant at Ms. Hunt's home.

> **10:20 p.m.** . . . . Ms. Hunt returns to her home.

**December 19, 2011:**

> **1:42 a.m.** . . . . Dr. Tape admitted the injury could have occurred this late (ten hours before Derrion was pronounced dead at 11:42 a.m.). Both Defendant and Ms. Hunt were with Derrion.

> **1:42 a.m. to 3:42 a.m.** . . . . According to Dr. Fruge, the earliest the injury occurred (eight to ten hours before Derrion was pronounced dead at 11:42 a.m.). Both Defendant and Ms. Hunt were with Derrion.

> **5:42 a.m. to 6:42 a.m.** . . . . According to Dr. Fruge, the best estimate of when the injury occurred (five to six hours before

24

Derrion was pronounced dead at 11:42 a.m.). Both Defendant and Ms. Hunt were with Derrion.

**5:04 a.m. to 9:04 a.m.** . . . . Dr. Tape estimates Derrion died based upon his body temperature taken upon arrival at the hospital, 11:04 a.m. (two to five hours before it was taken).

**9:00 a.m.** . . . . Defendant leaves Ms. Hunt's home.

**9:00 a.m. to 11:00 a.m.** . . . . Ms. Hunt and Tiffany testified Derrion was still responsive.

**11:04 a.m.** . . . . Ms. Hunt arrives at the hospital with Derrion, DOA (dead on arrival), according to the medical records. Derrion's body temperature is 93.3 degrees Fahrenheit.

**11:42 a.m.** . . . Derrion is pronounced dead.

According to the unrebutted testimony of the experts, the timeline shows that Defendant was present during all the times when the injury likely occurred. Although the evidence indicates Ms. Hunt was more than likely present when the trauma occurred, no evidence was presented to prove Ms. Hunt committed the abuse. Thus, we find that the jury obviously and reasonably rejected any hypothesis of innocence based on Ms. Hunt having committed the crime.

Next, Defendant does not question that the child died as a result of cruelty to a juvenile. Instead, he denies being the perpetrator of the crime. In *State v. Harris*, 14-981 (La.App. 3 Cir. 3/4/15), 157 So.3d 1230, a case similar to the present one, the defendant was convicted of second degree murder. A twenty-one-month-old female child was found dead at her home. The forensic pathologist, Dr. Christopher Tape (Dr. Tape), determined the cause of death to be "'acute peritonitis due to stomach perforation resulting from blunt force injuries,' and the

25

manner of death was determined to be homicide." *Id.* at 1233. Dr. Tape also found approximately sixteen bruises on the victim's body, all of which appeared to be less than eighteen hours old. On appeal, the defendant challenged the sufficiency of the evidence arguing in pertinent part:

> The defendant asserts that the State's case was based solely on circumstantial evidence since no eyewitnesses testified at trial as to seeing him kill the victim. He argues that there was insufficient evidence to prove he specifically intended to kill the victim, and there was insufficient evidence to prove that he killed the victim while committing the felony of cruelty to a juvenile. The defendant further asserts that there was a sufficiently reasonable hypothesis of innocence, that is, "Porsha Miller struck the fatal blow that caused the death of A.J.M. and was responsible for the repeated abuse of A.J.M."

*Id*. at 1240. This court held in pertinent part:

> Considering the victim's cause and manner of death, we find that there was sufficient evidence that whoever inflicted the injuries upon Aleecia Miller specifically intended to kill the victim *or* to inflict great bodily harm, *or* without such intent, killed her while committing cruelty to a juvenile. The evidence was sufficient to prove that whoever inflicted the injuries intentionally mistreated the victim, thus committing cruelty to a juvenile. Where the cause of death was non-accidental blunt force trauma, and the bruises were inflicted within eighteen hours of the discovery of the victim, there was sufficient evidence to prove that the victim died during the commission of cruelty to a juvenile. The only issue remaining is the identity of the person who inflicted the injuries. This court has stated the following regarding circumstantial evidence:
>
> > [W]hen the conviction is based upon circumstantial evidence, La.R.S. 15:438 provides that such evidence must exclude every reasonable hypothesis of innocence. *State v. Camp*, 446 So.2d 1207 (La.1984); *State v. Wright*, 445 So.2d 1198 (La.1984). However, La.R.S. 15:438 does not establish a stricter standard of review on appeal than the rational juror's reasonable doubt standard. . . . On appeal, the issue is whether a rational trier of fact, when viewing the evidence in a light most favorable to the prosecution, could find that all reasonable hypotheses of innocence were excluded.
>
> *State v. Dotson*, 04-1414, p. 2 (La.App. 3 Cir. 3/2/05), 896 So.2d 310, 312. Additionally, when a jury "'reasonably rejects the hypothesis of

26

innocence presented by the defendant[ ], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt.'" *State v. Strother*, 09-2357, p. 11 (La.10/22/10), 49 So.3d 372, 378 (quoting *State v. Captville*, 448 So.2d 676, 680 (La.1984)).

> In support of his hypothesis of innocence, the defendant refers to his December 18th statement wherein he told Detective Phillips that he saw Porsha swinging wildly at the victim. He also refers to the conditions in which Porsha and Aleecia lived before coming to Louisiana--living in an abandoned store, being dirty, and the victim's [sic] having sores all over her body. These facts, the defendant argues, show that the victim was neglected before she began living with him. We note, however, that none of the defendant's relatives who testified at trial recalled seeing bruises on Aleecia when she came to Louisiana. The jury obviously rejected the defendant's hypothesis of innocence. Considering all facts established--the victim lived with the defendant; she had bruises all over her body; there was delay in reporting her death; the defendant made inconsistent statements to the police about what happened; he told Mr. Guin he got carried away and whipped the victim "pretty rough" and then tried to revive her with CPR; and Mr. Guin's report of hearing the defendant tell Porsha to forgive him, stick with the story, and no one would find out what happened--we find the jury's rejection of the defendant's hypothesis of innocence reasonable.

*Id.* at 1240-41.

In applying the *Jackson* standard when the conviction is based on circumstantial evidence, we find that the evidence admitted at trial clearly and strongly indicates that Defendant was the perpetrator. As noted above, Defendant and Ms. Hunt were the only possible people who could have committed the offense. No evidence was presented to show that Ms. Hunt was the abuser. Additionally, there was unrebutted testimony that on at least three other occasions when the child was in the care of Defendant, the child was injured. Moreover, the unrebutted testimony of the experts indicates that Defendant was present at the time when the injury occurred. Thus, after viewing all of the evidence in a light most favorable to the prosecution, we find it is sufficiently reasonable that a

27

rational juror could have found proof of guilt beyond a reasonable doubt. Therefore, we affirm Defendant's conviction.

## DISPOSITION

Defendant's conviction is affirmed.

**AFFIRMED.**